Bichard S. Heller, J.
This is an action to recover damages for the appropriation of real property for the improvement and development of the international rapids section of the St. Lawrence Biver pursuant to section 30 of the Highway Law as made applicable by title 1 of article 5, of the Public Authorities Law.
The property appropriated is shown as parcels 85, 86, 172 and 173 on Map No. 62B2 of the St. Lawrence Biver Project, St. Lawrence County, and reference is made to Schedule “A” of the claim herein for a detailed description. The appropriated property consisted of 285.6 acres of land with improvements thereon, including a house, horse barn, granary and shed. The property is located about six miles northeast of the Village of Massena on the south side of the St. Lawrence Biver opposite the easterly end of Barnhart Island. It has a river frontage of about 3,450 feet, including an area known as Hawkins Point. The width of the river between Hawkins Point and Barnhart Island is about the narrowest in the locality. The St. Lawrence Biver Boad ran through the property with about 32.34 acres designated as parcels 85 and 86 on the appropriation map lying between the road and the river and 253.12 acres designated as parcels 172 and 173 on the appropriation map lying south of the road. About 1,600 feet of the southerly end of the westerly boundary of the property ran along the Kinnie crossroad.
The property was conveyed to Justin B. Andrews, the deceased father of the three claimants by two deeds, one dated October 15, 1897 and the other dated June 8, 1907. The property was used by claimants’ father and by claimants as a tenant farm until about October, 1953 when a cattle barn located on the premises burned and agricultural activities were discontinued. Prior to 1904 or 1905 the property was also used as a ferrying point.
On October 6, 1954 there was filed in the office of the Department of State a map covering a temporary easement on the property located between the St. Lawrence Biver Boad and the river for a steel truss floating bridge, approach and appurtenances “ for use and exercisable during the construction of the *220 St. Lawrence Power Project until the approval of the completed work, unless sooner terminated if deemed no longer necessary for Power Authority of the State of New York purposes and released, by order of the Chairman of the Power Authority of the State of New York.” This map was never filed in the office of the Clerk of St. Lawrence County and never served upon the claimants. The State or its agencies or agents entered upon the property described in that map on or about October 13, 1954. Subsequently a map covering the fee to the entire plot including the property between the river and the St. Lawrence River Road and the property lying south of the St. Lawrence River Road was filed in the office of the Department of State on March 21, 1955. This map was never filed in the office of the Clerk of St. Lawrence County and never served upon the claimants. On December 23, 1955 a further map covering the fee to the entire plot was filed in the office of the Department of State and this map was filed in the office of the Clerk of St. Lawrence County on January 3, 1956 and served upon the claimants on August 16,1956.
The State asserts that it entered upon the property lying north of the St. Lawrence River Road on about October 13,1954 and upon the balance of the property lying south of the St. Lawrence River Road on May 11, 1955. The testimony of the claimant John M. Andrews is that about April 19, 1955 he observed at least three power transmission line poles located on the property south of the St. Lawrence River Road and other indications of construction work.
When the State appropriates private property it assumes the obligation of making just compensations for that which is taken. (N. Y. Const., art. I, § 7, subd. [a].) The measure of this obligation is the full market value of what is taken, giving consideration to all factors affecting the property and which would be considered by a reasonable seller and a reasonable purchaser in arriving at a purchase price. (Sparkill Realty Corp. v. State of New York, 254 App. Div. 78, affd. 279 N. Y. 656.) In considering these relevant factors affecting value it must be assumed that the property would be valued for its most profitable use and where a particular piece of property is enhanced by a present recognition of its adaptability and suitability for a particular use, such elements must be considered. (Matter of Niagara, Lockport & Ontario Power Co. v. Horton, 231 App. Div. 402; Matter of Simmons, 130 App. Div. 350, affd. 195 N. Y. 573, affd. 229 U. S. 363.)
The State does not disagree with these principles governing awards for the appropriation of property. It contends however *221 that under the circumstances, of this case, the property appropriated had a fair market value only as a farm with the possible utilization of some of the 3,450 feet of river front for development as cottage lots. It maintains that no value can be attributed to this property by reason of its suitability for use in the production of hydroelectric power since this would be ascribing a value in the flow of the stream to the real property and this value in the flow of the stream was at all times the property of the State to which the rights of the claimants herein as riparian owners were servient. The State asserts that no value may be ascribed to this property for its suitability and adaptability for use in conjunction with the development of hydroelectric power in the St. Lawrence River for such purposes as the location of transmission lines or to provide ready accessibility to Barnhart Island since such use was totally dependent upon the development of the river by the State and such value would therefore either not have been considered by a purchaser or reflects an enhancement by reason of the development itself, to which value the claimants are not entitled. Applying these contentions to this case; the conclusions as to value by the witnesses for the State were based almost entirely upon the assumption that this property had no value except for farm purposes.
The St. Lawrence River is a navigable stream and as such it is subject to the control and regulation of the United States and the State of New York in the interests of commerce and navigation. (Matter of Long Sault Development Co. v. Kennedy, 212 N. Y. 1; Matter of Niagara Falls Power Co. v. Water Power & Control Comm., 267 N. Y. 265.) Under these circumstances no damage arises from interference with riparian rights where the public interests in commerce and navigation are present. Destruction of the access of a riparian owner to the navigable channel or even diversion of the water will not give rise to any claim for damages. (Niagara Falls Power Co. v. Duryea, 185 Misc. 696.) This power to so control, regulate and change the water resources of the State has been held to extend to any area of public interest and is not limited solely to improvement of navigation. (Niagara Falls Power Co. v. Duryea, supra; People v. System Properties, 2 N Y 2d 330.)
In this case, however, there has not been and there apparently has never been any intention on the part of the State to interfere with the flow of water past the claimants’ upland, to flood the upland or to in any way destroy the right of access to the navigable channel which they had as riparian owners. Thus the situation seems to fall within the statement in the opinion in Niagara *222 Falls Power Co. v. Duryea (supra, p. 703), that “ where the upland of the riparian owner is taken hy the State for barge canal purposes, which would presumably be a sovereign act in the interests of navigation, the ‘ ordinary riparian rights ’ in a navigable river incidental to the land taken must be paid for (Danes v. State of New York, 219 N. Y. 67, 76). In the same general direction is Waterford El. L., H. & P. Co. v. State of New York (208 App. Div. 273).”
In Danes v. State of New York (219 N. Y. 67), the State had appropriated land contiguous to the Mohawk River for Barge Canal purposes and the Board of Claims awarded $1,000 for the bed of the Mohawk River in addition to an award for the uplands. The court held that the claimants did not own the bed of the Mohawk River and were therefore not entitled to any award for the appropriation of that property. In the concluding paragraph of its decision the court wrote (p. 76): “ From the language of the determination of the Board of Claims, we are uncertain whether or not the Board intended to find a damage to the ordinary riparian rights of the respondents by reason of the taking of the land between their remaining lands and the river. That part of the determination awarding the sum of one thousand dollars, in addition to the eight thousand and fifty dollars should be reversed, with costs in the Appellate Division and this court, and the matter remitted to the Court of Claims to determine and award the respondents the damages sustained by them, if any, by reason of the interference with their ordinary riparian rights through such taking.”
It follows therefore that consideration must be given to the location of this land and its contiguity to the river in arriving at its fair market value. We cannot regard the decisions in United States v. Twin City Power Co. (350 U. S. 222) and United States v. Chandler-Dunbar Water Power Co. (229 U. S. 53) as requiring a different result. The effect of these cases is to hold that where property is condemned for use as an integral part of the flow of the stream the condemnee is not entitled to the value of the property when so used since it is entirely within the power of the Federal G-overnment to determine all factors governing the flow of the stream. Thus, one part of the decision in United States v. Chandler-Dunbar Water Power Company dealing with the island owned by St. Mary’s Power Company rejected any value arising from its location as a necessary part of a comprehensive system of river improvement. On the other hand, in the same decision, the court approved the finding of an additional value in the strip of land owned by the Chandler-Dunbar Water Power Company arising from its availability and *223 suitability for lock and canal purposes. It seems quite clear that the canal and lock use could only be carried out in an exercise of the sovereign’s control over commerce and navigation and yet the paramount right of the sovereign over the flow of the stream for these purposes would not permit the appropriation of that property without compensation for that aspect of its value.
It is questionable that any other reading of the decision in United States v. Twin City Power Co. (supra) would be in accord with the law of the State of New York as set forth in Danes v. State of New York (supra), Waterford Elec. Light, Heat & Power Co. v. State of New York (supra) and Niagara Falls Power Co. v. Duryea (supra).
In the instant case there is no intimation that this property was ever intended or was suitable and adaptable for use as an integral part of the flow of the stream. It follows that if this property had a particular suitability and adaptability for such adjunct use to hydroelectric development as the transmission of the energy product of that development, or as a means of access to Barnhart Island and that such use was neither conjectural nor speculative, then the value for such use must be considered in arriving at fair market value.
We do not believe that the case of United States v. Miller (317 U. S. 369) requires any different result. The increment of value prohibited by the Miller decision for inclusion in the determination of fair market value is a speculative value and not all value resulting from the relationship of the property to the proposed improvement. This again is clearly established by the decision in United States v. Chandler-Dunbar Water Power Co. (supra), where the award of the additional value because of the suitability and the availability of the property for the very purpose of the improvement was sustained since that use was not purely conjectural or speculative.
In the instant case the proof by the State falls far short of establishing that these claimants or the general public could or did have any knowledge that this property was to be included in land appropriated for the accomplishment of the river improvement and hydroelectric development. The map in evidence as claimants’ Exhibit No. 34, prepared by the United States Corps of Engineers in 1941, does not show this property as being used for any part of the comprehensive river development. The State’s own procedure indicates that it was only after the project was well under way that the determination was made that the appropriation of this property was desirable and necessary for the development. The State’s witness testified *224 that the original planning for power transmission did not provide for a transmission line on this property. The original appropriation map filed in the office of the Secretary of State covered only a temporary easement over the property located between the St. Lawrence River Road and the river. Thus it cannot be said that there was any increase in value from 1 ‘ the known fact that the lands probably would be condemned ” (United States v. Miller, supra, p. 377), since there was no such knowledge in this case.
A conclusion as to the fair market value of what has been taken from these claimants requires a consideration of the property as including substantial frontage on a navigable stream with its accompanying ordinary riparian rights utilized for its highest and best use in consideration of its location and the existing circumstances as of the date of appropriation on January 3, 1956. The conclusions as to value by the witnesses presented for the State are totally inapplicable since those conclusions equate this property with all other farm property in St. Lawrence County regardless of the geographical relationship of such other farm property with the river and the activities in the area, including both the improvement itself and the changes which were taking place and reasonably could have been anticipated as a result of the improvement.
This position of the State has unfortunately deprived the court of much pertinent information. For instance, the testimony and report (State’s Exhibit “ 0 ”) of Dr. Sufrin is based almost entirely upon consideration of agricultural aspects of St. Lawrence County and the St. Lawrence area and gives no information as to other aspects of the economy of the area and changes taking place therein which are indicated in the report itself. Dr. Sufrin points out that agricultural employment decreased in the decade from 1940 to 1950 by some 17.5%, but the total employment in the county increased approximately 20%. Thus there apparently was a significant change in the nature of the economic status of St. Lawrence County in that decade with an increasing importance of manufacturing, industrial and commercial activities. He also points out in that report that certain property located in the Town of Louisville which faces the St. Lawrence River was sold for industrial purposes in 1953 at the rate of $750 per acre. There is thus an indicated demand only hinted at in the State’s evidence for industrial and commercial use of land in this area.
The claimants’ witness concluded from his study of the area that the highest and best use of this property was for industrial and commercial purposes, including such use as access to Barn- *225 hart Island and the disposition of the product of the development of water power. His conclusion as to the present market value of this property for industrial and commercial purposes, however, is weakened by his lack of knowledge as to the available means of transportation and other factors affecting the immediate usefulness of the property for such purposes. This witness seems to have given considerable weight to the options maintained on the property from 1930 until 1941 by the Frontier Corporation.
These options are certainly a proper factor to be considered but there is no delineation as to the use intended for the property and as an indication of value the options must be treated with great caution. If the Frontier Corporation intended to flood this land or adapt it as an integral part of the flow of the stream, the value contained therein might well include some value accruing from an exercise of the paramount right of the sovereign and to that extent if such be the case it would not reflect the value which these claimants are entitled to receive. The agreed purchase price contained in these options is essentially of no evidentiary value for the foregoing reason and also due to the remoteness in time and the substantial changes which have occurred in the real value of our medium of exchange.
The court then has before it a conclusion of value by an expert for the claimants of $196,826 made up of the valuation of parcels 85 and 86 lying between the St. Lawrence Biver and the Biver Boad at $1,000 an acre and parcels 172 and 173 lying south of the Biver Boad at $650 per acre, and a conclusion by a real estate expert presented for the State of a total value of $20,300 or at a rate of $71.10 per acre for both land and buildings. This conclusion by the State is based entirely upon the assumption that what has been taken from the claimants was an abandoned farm which had a highest and best use for agricultural purposes alone.
One further aspect of the testimony by the expert for the State seems to raise a considerable question. He conceded that he furnished a statement to the Department of Public Works stating the fair market value of this property to be $32,500 and subsequently furnished the appraisal used as a basis for his testimony in the trial of this action, stating an opinion of fair market value of $20,300. He explains this discrepancy on the basis that his original estimate made in about September, 1955 included prospective costs of acquisition as provided for in subdivision 16 of section 30 of the Highway Law. The court can accept this explanation although it is somewhat astounded that in obtaining *226 such an estimate the Department of Public Works requires a statement by the appraiser that it is an opinion of fair market value.
The thing which the court has difficulty in accepting in this case is the discrepancy between the two figures. On his testimony this witness was estimating the acquisition cost to be more than 60% of the fair market value of the property. If as the State argues the “ expense of the acquisition thereof ” provided for in subdivision 10 of section 1007 of the Public Authorities Law is intended to cover the expenses set forth in subdivision 16 of section 30 of the Highway Law, the question is immediately raised as to how this particular witness is in any way qualified to arrive at the amount of such expense. Actually the testimony of the witness seems to indicate that he felt that the inclusion of more than 60% of his opinion of the fair market value might result in saving the State the cost of the trial of the proceeding but such costs are not specifically referred to in subdivision 16 of section 30 of the Highway Law at all. It appears that this witness recognized that there had to be a substantial difference of opinion between the property owner and himself as to fair market value.
The evidence establishes that any willing buyer and willing seller would have contemplated a use for this property as of the date of appropriation for industrial and commercial purposes, including uses arising from and connected with the development of hydroelectric power and the St. Lawrence Seaway. There is evidence of a demand, desire and need for this type of use in the area and this property was suitable for and adaptable to such use. The exact time of such a development as of the date of the appropriation was indeterminate but was sufficiently certain as to remove it from the speculative and conjectural, although the indeterminate time would necessarily entail some discount for that unknown factor. The court finds that the fair market value of the land appropriated is $65,000 and the claimants are entitled to a judgment in that amount.
The court has viewed the premises and the claim has not been assigned.
This leaves for determination the problem of the State’s own making arising from the manner in which the appropriation was made and the question concerning the date of entry onto the premises. The appropriation was not made until January 3, 1956 by the filing of the map in the County Clerk’s office. The State, however, had obtained a right of entry onto parcels 85 and 86 by the filing of a map in the office of the Secretary of the State on October 6, 1954, and it actually deprived this claimant *227 of his use of that property by an entry thereon on October 13, 1954. The State filed a further map covering all four parcels in the office of the Secretary of State on March 21, 1955 and there is a conflict in the evidence as to when the State entered upon parcels 172 and 173.
On the trial the State moved to dismiss any claim for a temporary taking on the ground of a failure of proof of value and decision was reserved thereon. The position taken by the State seems to ask this court to approve the devotion of the property of these claimants to a public use under properly authorized procedure from October 13, 1954 to January 3, 1956 so far as parcels 85 and 86 are concerned and the right to make such entry as to parcels 172 and 173 from March 21, 1955 with an actual entry pursuant thereto sometime in March, April or May of 1955 without compensation therefor. We believe that such a result even without specific proof by the claimants as to fair rental value for the period would violate the constitutional requirement for just compensation. Where the occupancy and appropriation are not simultaneous, claimant has two causes of action. If he can show that the parcel taken has a fair rental value he may recover that amount but in the absence of proof of fair rental value the legal interest rate is generally considered to be a fair measure of the damage and to meet the constitutional requirement of just compensation. (Robert S. Smith Corp. v. State of New York, 49 N. Y. S. 2d 579.)
The claimants are therefore entitled to interest at the rate of 4% on $9,700 from October 13, 1954 to January 3, 1956. This award is just compensation for the use of the property contained in parcels 85 and 86 from the admitted date of entry thereon by the State to the date of appropriation thereof.
On parcels 172 and 173 the evidence is conflicting but certainly the State obtained the right to enter thereon on March 21, 1955 and the direct testimony of the claimant John Andrews is that he observed power transmission line poles erected and in place on part of this plot about April 19, 1955 although the affidavit of the attorney for the State, upon information and belief, shows that no entry was made until May 11, 1955. Under the circumstances the court finds that the State entered such property on or about April 1, 1955 and claimants are therefore entitled to interest on the sum of $55,300 at the rate of 4% per annum as compensation for the use of that property by the State from April 1, 1955 to January 3, 1956, the date of appropriation.
The title vested and the claim accrued by the filing of the map in. the St. Lawrence County Clerk’s office on January 3, 1956, although service was not made upon the claimants until August *228 16,1956 and the claim was not filed until October 31,1956. Under these circumstances the claimants are entitled to interest on the sum of $65,000 from January 3, 1956 to July 3, 1956, and from October 31,1956 to April 28, 1958, and from September 16,1958 to the date of entry of judgment as provided by order of this court. (La Porte v. State of New York, 6 N Y 2d 1.)
Let judgment be entered accordingly.